**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MAGGIE CARROLL,

       Plaintiff,

          v.

THYSSENKRUPP ELEVATOR
CORPORATION,

       Defendant.

---

ZENITH INSURANCE COMPANY,

       Plaintiff,

          v.

THYSSENKRUPP ELEVATOR
CORPORATION,

       Defendant.

---

THYSSENKRUPP ELEVATOR
CORPORATION,

       Third-Party Plaintiff

          v.

TRIAD SENIOR LIVING, INC. d/b/a
WATERFORD ESTATES AND
AFFORDABLE COMMUNITY HOUSING
TRUST-EPSILON,

       Third-Party Defendants

Case Nos. 20 C 6699; 20 C 7220

Magistrate Judge Beth W. Jantz

## MEMORANDUM OPINION & ORDER

For the reasons set out below, the Court grants third-party Defendant Triad Senior Living, Inc's ("Triad") motion to dismiss as to Counts II and IV of Thyssenkrupp Elevator Corporation's ("TKE") third-party complaint against it, and denies the motion as to Count I. Triad's motion to amend its answer to Count III to include the affirmative defense of contributory negligence is denied. TKE's motion for summary judgment on Count III is granted.

A joint status report is due by 9/8/2023, following the parties' mediation, to report either that the cases have settled or, if not, the parties' proposed next steps and timeline for proceeding with these cases.

## RELEVANT BACKGROUND

This consolidated matter involves two diversity actions, one by Plaintiff Maggie Carroll (20 C 7220), and another by Plaintiff Zenith Insurance Company (20 C 6699), brought against Defendant Thyssenkrupp Elevator Corporation ("TKE"), asserting Illinois state-law claims of defective design, failure to warn, and negligence, arising out of an elevator accident on November 12, 2018. The Plaintiffs allege that Maggie Carroll ("Carroll") was injured at her workplace, Waterford Estates, when an elevator on which she was riding unexpectedly fell several floors. [Zenith Dkt. 1 at 4; Carroll Dkt. 8 at 2.[1]] Zenith is the workers' compensation insurance carrier for Carroll's employer, Triad Senior Living ("Triad"), and alleges it has paid to Carroll workers' compensation benefits arising from this incident. [Zenith Dkt. 1 at 4.] Plaintiff Zenith is seeking to

---

[1] Many of the documents referenced herein have been filed on the dockets of both the Zenith matter at Case No. 20 C 6699 and the Carroll matter at Case No. 20 C 7220. For ease of reference, all docket citations are to the documents filed in the Zenith matter, Case Number 20 C 6699, unless otherwise noted.

recover from TKE all amounts provided for pursuant to the Illinois Workers'
Compensation Act, 820 ILCS 305/5(b), and Plaintiff Carroll also seeks damages from
TKE for the incident. [Zenith Dkt. 1 at 4, 11; Carroll Dkt. 1 at 2-4.]

Prior to the November 2018 incident, Carroll's employer, Triad, had entered into
a Maintenance Agreement ("Agreement") with TKE. Under the Agreement, TKE was to
regularly examine the elevator equipment at Triad's Waterford Estates facility for
optimum operation, lubricate the equipment for smooth and efficient performance, and
adjust elevator parts and components to maximize performance and safe operation.
[Zenith Dkt. 86-3 at 3.] Triad also shared responsibility over the proper functioning of
the elevator; under the "safety" heading of the Agreement, Triad agreed to, among other
things, "provide a suitable machine room, including secured doors, waterproofing,
lighting, ventilation, and appropriate air temperature control to maintain that room at a
temperature between 50 degrees F and 90 degrees F." [Zenith Dkt. 86-3 at 5.]

TKE has filed a third-party complaint against Triad, alleging that it is Triad—not
TKE—who is responsible for the elevator's fall because Triad failed to keep the elevator
machine room at an adequate temperature, as required under the Agreement. [Zenith
Dkt. 86.] TKE's amended complaint against Triad [Zenith Dkt. 86] contains four counts:
Count I, seeking contribution under the Joint Tortfeasor Contribution Act, 740 ILCS
100/1; Count II, seeking indemnification under the parties' Maintenance Agreement;
Count III, alleging breach of duty to insure, based on language in the Maintenance
Agreement requiring Triad to name TKE on its insurance policy; and Count IV, alleging
spoliation of relevant evidence because Triad allegedly failed to preserve video footage
of Plaintiff Carroll exiting the elevator after the incident.

Several portions of the parties' Maintenance Agreement are relevant here. Under

the heading "Other," the Agreement provides:

> In consideration of ThyssenKrupp Elevator performing the services herein
> specified, you [Triad] expressly agree to the fullest extent permitted by law, to
> indemnify, defend, save harmless, discharge, release, and forever acquit
> ThyssenKrupp Elevator Corporation, our employees, officer, agents, affiliates,
> and subsidiaries from and against any and all claims, demands, suits, and
> proceedings brought against ThyssenKrupp Elevator, our employees, officer,
> agents, affiliates, and subsidiaries for loss, property damage (including damage to
> equipment which is the subject matter of this Agreement), personal injury or
> death that are alleged to have been caused by the Purchaser [Triad] or any others
> in connection with the presence, use, misuse, maintenance, installation, removal,
> manufacture, design, operation or condition of the equipment covered by this
> Agreement, or the associated area surrounding such equipment. Your duty to
> indemnify does not apply to the extent that the loss, property damage (including
> damage to the equipment, which is the subject matter of this Agreement),
> personal injury, or death is determined to be caused by or resulting from the
> negligence of ThyssenKrupp Elevator and/or our employees. You recognize that
> your obligation to ThyssenKrupp Elevator under this clause includes payment of
> all attorney's fees, court costs, judgment, settlement, interest, and any other
> expenses of litigation arising out of such claims or lawsuits.

[Zenith Dkt. 86-3 at 5-6.]

> Also relevant, the "Other Conditions" portion of the Agreement provides:

> In addition, we [TKE] will not be required to make any changes or
> recommendations in the existing design or function of the unit(s), nor will we be
> obligated to install new attachments or parts upon the equipment as
> recommended or directed by insurance companies, governmental agencies or
> authorities, or any other third party. Moreover, we shall not be obligated to
> service, renew, replace and/or repair the equipment due to any one or more of
> the following: anyone's abuse, misuse, and/or vandalism of the equipment;
> anyone's negligence in connection with the use or operation of the
> equipment;...or any other reason or cause beyond our control that effects the use
> or operation of the equipment. You expressly agree to release and discharge us
> and our employees for any and all claims and /or losses (including personal
> injury, death, and property damage, specifically including damage to the Property
> which is the subject matter of this Agreement) associated therewith or caused
> thereby...you expressly agree to release and discharge ThyssenKrupp Elevator
> from any and all claims for consequential, special or indirect damages arising out
> of the performance of this Agreement. In no event shall ThyssenKrupp Elevator's
> liability for damages arising out of this Agreement exceed the remaining unpaid
> installment of the current, unexpired term of this Agreement.

[Zenith Dkt. 86-3 at 6.]

4

Finally, under the "Insurance" heading, Triad expressly agreed to:

name ThyssenKrupp Elevator Corporation along with its officers, agents, affiliates, and subsidiaries as additional insureds in [Triad's] liability and any excess (umbrella) liability insurance policy(ies). Such insurance must insure ThyssenKrupp Elevator Corporation along with its officers, agents, affiliates, and subsidiaries.

[Zenith Dkt. 86-3 at 6.] The insurance was also to "specify that its coverage is primary and non-contributory," and Triad was to "waive the right of subrogation." [Id.]

Triad has moved to dismiss Counts I, II, and IV of TKE's third-party complaint. [Zenith Dkt. 88], which TKE opposes, [Zenith Dkt. 96], and Triad has filed a reply [Zenith Dkt. 99]. TKE has also filed a motion for summary judgment on Count III [Zenith Dkt. 113], which Triad opposes, [Zenith Dkt. 117]. Triad also has filed a motion to amend its answer to Count III to include an affirmative defense of contributory negligence [Zenith Dkt. 116], which TKE opposes and has moved to strike [Zenith Dkt. 123]. After Triad filed their response opposing summary judgment and their motion to amend their answer, TKE filed a reply in support of summary judgment on Count III [122], and Triad has filed a sur-reply [Zenith Dkt. 124.]

For the reasons that follow, Triad's motion to dismiss is granted in part (as to Counts II and IV) and denied in part (as to Count I). Triad's motion to amend its answer to Count III to include the affirmative defense of contributory negligence is denied. TKE's motion for summary judgment on Count III is granted.

## DISCUSSION

### I. Triad's Motion to Dismiss Counts I, II, and IV

#### a. Legal Principles

This a diversity action involving a workers' compensation claim made in the state of Illinois, an alleged personal injury that occurred in the state of Illinois, and a maintenance contract that was executed and performed within the state of Illinois. This Court therefore applies substantive Illinois law to the claims in this case while applying the federal rules to procedural matters. *See Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002) (explaining that "the task of the federal court sitting in diversity is to ascertain the substantive content of state law as it either has been determined by the highest court of the state or as it would be by that court if the present case were before it now"); *see also Fid. Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 750 (7th Cir. 2005) ("The Federal Rules of Civil Procedure, not state procedural rules, govern in diversity, as they do in federal-question, cases in federal district courts.").

To survive a motion to dismiss under Federal Rule 12(b)(6), the complaint must contain a "short and plain statement of the claim showing the pleader is entitled to relief[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). The complaint must also include sufficient facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating plausibility, the court must accept all factual allegations in the complaint as true. *Id.* Moreover, to be "plausible," the pleaded facts must "suggest a right to relief that is beyond the speculative level." *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (internal citations omitted). "While detailed factual allegations are not

necessary to survive a motion to dismiss, it does require more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action to be considered adequate." *Id.* (internal citations omitted).

### b. Illinois Workers' Compensation Scheme and the *Kotecki* Cap

Before diving into Triad's arguments for dismissal of TKE's contribution and indemnification claims (Counts I and II), some background on Illinois' Workers' Compensation scheme is helpful. Under the system, employees can obtain compensation from their employer for job-related injuries or illnesses without proving fault. *See Baltzell v. R & R Trucking Co.*, 554 F.3d 1124, 1127 (7th Cir. 2009); 820 Ill. Comp. Stat. 305/1 et seq. (Illinois Workers' Compensation Act ("IWCA")). In exchange for not having to prove fault, employees are limited in the amount they can recover from their employer—they may receive only workers' compensation benefits and cannot sue their employers to receive additional damages. *See id.* (*citing* 820 Ill. Comp. Stat. 305/5(a)).

When a party *other* than an employer causes an employee to be injured at work, however, the IWCA allows the employee to sue that third party for damages. *Baltzell,* 554 F.3d at 1127; *citing* 820 Ill. Comp. Stat. 305/5(b) ("Where the injury or death for which compensation is payable under this Act was caused under circumstances creating a legal liability for damages on the part of some person other than his employer to pay damages, then legal proceedings may be taken against such other person to recover damages notwithstanding such employer's payment of or liability to pay compensation under this Act."). If the third party believes the employer was at fault, the IWCA allows the third party to seek contribution from the employer by pulling the employer into the suit. *Baltzell,* 554 F.3d at 1127.

That is what happened here—Plaintiff Carroll sustained an injury on the job and received workers' compensation benefits from her employer, Triad (via its insurer, Zenith). She has now filed a lawsuit for additional damages against third party TKE, who she believes is additionally or alternatively responsible for the elevator incident. But that is not all—what appears to make this case unique is that Triad's workers' compensation insurer, Zenith, has *also* filed a suit against TKE, alleging that TKE should repay to Zenith what Zenith already has paid and will continue to pay, hundreds of thousands of dollars in medical and indemnity obligations as a result of the elevator incident. [Zenith Dkt 1 at 2.] Neither Triad nor TKE addresses what impact, if any, Zenith's presence in these lawsuits has on the contribution issue, so the Court will not address it at this time.[2]

Once an employer has been brought into an employee's suit against a third party, two things happen. First, the IWCA grants the employer a lien against the employee's potential damages from the third party, such that the employer can be reimbursed for the workers' compensation benefits it paid for injuries actually caused by the third party. *West v. Off. Depot, Inc.*, No. 19 CV 4356, 2021 WL 5048346, at *1 (N.D. Ill. Jan. 4, 2021). If the employer *prefers* to pay workers' compensation rather than a

---

[2] Early on in Zenith's action against TKE, case number 20 cv 6699, and before the parties consented to the jurisdiction of the undersigned Magistrate Judge, TKE filed a motion to dismiss against Zenith that was denied by the then-assigned District Judge. In the Motion, TKE argued that Triad had waived its right of subrogation in the Maintenance Agreement and therefore its insurer, Zenith, could not assert subrogation rights against TKE, because Zenith "steps into the shoes" of its insured. [Dkt. 26 at 2.] TKE further argued that Zenith would still have a valid lien against Plaintiff Carroll's recovery in the separate matter, just not through a subrogation action against TKE. [Zenith Dkt. 26 at 5.] The District Judge found that these arguments were not properly supported by any cited federal case law and therefore allowed Zenith's separate action to go forward, concluding that more factual development was warranted. [Dkt. 30.]

contribution payment (sometimes this is preferable to the employer), the employer can waive this lien and simply pay the workers' compensation benefits, *see LaFever v. Kemlite Co., a Div. of Dyrotech Indus.*, 185 Ill. 2d 380, 404-05, 706 N.E.2d 441, 454 (1998). Here, Triad has paid workers compensation benefits to Carroll through its insurer, Zenith, and Zenith is now attempting to recoup those benefits from TKE, suggesting that any lien against Carroll's potential recovery has not been waived here (though Triad has not articulated in its motion to dismiss briefing whether the lien has been waived or not).

The second thing that happens is, if the employer does not waive the lien and stays in the contribution action, the employer can invoke the so-called "*Kotecki* cap," which limits the employer's contribution liability to nothing more than what the employer would have been on the hook for through workers' compensation. *Kotecki v. Cyclops Welding Corp.*, 146 Ill. 2d 155, 165, 585 N.E.2d 1023, 1028 (1991). In other words, even if the employer's *pro rata* share of the damages is higher than it would pay in workers' compensation benefits, an employer cannot be made to pay more. However, the Illinois Supreme Court has explained that this is not an automatic cap, but rather an affirmative defense that can be waived preemptively by contract. *See Virginia Sur. Co. v. N. Ins. Co. of New York,* 224 Ill. 2d 550, 558-59, 866 N.E.2d 149, 155 (2007) (explaining that "an employer may waive its *Kotecki* protection by contract and thereby be liable for its full pro rata share of contribution" and when that happens, "the employer is waiving its affirmative defense provided by the Workers' Compensation Act"); *Braye v. Archer-Daniels-Midland Co.*, 175 Ill. 2d 201, 210, 676 N.E.2d 1295, 1300 (1997) ("We determine that nothing in *Kotecki* prohibits an employer from agreeing to remain liable for its pro

rata share of damages proximately caused by its negligence, notwithstanding the employer's ability to avail itself of the *Kotecki* cap on its liability.").

### c. TKE's Count II  (Indemnity)

Triad argues that TKE's contribution claim in Count I and indemnification claim in Count II are duplicative, and that Count II should be dismissed as a result. [Zenith Dkt. 88 at 7-8.]  TKE argues that these are distinct claims grounded in different authority; Count I of TKE's third-party complaint against Triad seeks contribution under Illinois' Joint Tortfeasors Act, while Count II of TKE's amended complaint seeks indemnification under the parties' Maintenance Agreement. [Zenith Dkt. 86 at 4-5.] Triad further argues that both Count I and Count II should be dismissed for seeking damages beyond what is allowable under the *Kotecki* cap [Zenith Dkt. 88 at 5-6, 8], to which TKE responds that the *Kotecki* cap has been waived [Zenith Dkt. 96 at 3-4.].  As explained below, the Court agrees with Triad that the language in the two pertinent(a) sections of the Maintenance Agreement are not indemnification clauses and thus do not give rise to an indemnity claim (Count II), but TKE may still seek contribution (Count I).

The Illinois Supreme Court has provided a roadmap on these issues in *Virginia Surety Co., Inc.*, 224 Ill. 2d at 564-565. That case involved a contract between a contractor (Capital) and a subcontractor (De Graf) that contained language similar to the language found in Triad's and TKE's Maintenance Agreement. Id. at 563.  That language required De Graf to "indemnify" Capital for De Graf's own negligence only (not for Capital's negligence). *Id*. Specifically, the language stated that "to the fullest extent permitted by law," De Graf "shall indemnify and hold harmless" Capital for claims "arising out of or resulting from the performance of the subcontractor's work" and "loss which is caused in whole or in part by any negligent acts or omissions of the

Subcontractor." *Id.* at 565. This was so even if Capital was partially responsible for the injury or loss, as the contract provided, "regardless of whether or not such claim, loss, or expense is caused in part by a party indemnified hereunder." *Id.*

As here, the subcontractor's employee in *Virginia Surety* (Smith) alleged an injury, sued the contractor for damages, and the contractor brought the subcontractor into the suit alleging shared responsibility for the employee's injuries. 224 Ill. 2d at 567. The Illinois Supreme Court found that the action was properly considered an action in contribution, rather than indemnity, despite the contract's use of the term "indemnity." *Id.* With reference to Black's Law Dictionary, the Court explained:

> Contribution is defined as "[t]he right that gives one of several persons who are liable on a common debt the ability to recover ratably from each of the others when that one person discharges the debt for the benefit of all; the right to demand that another who is jointly responsible for a third party's injury supply part of what is required to compensate the third party." Black's Law Dictionary 352–53 (8th ed. 2004).

> Indemnity is the "[r]eimbursement or compensation for loss, damage, or liability in tort; esp., the right of a party who is secondarily liable to recover from the party who is primarily liable for reimbursement of expenditures paid to a third party for injuries resulting from a violation of a common-law duty." Black's Law Dictionary 784 (8th ed. 2004).

*Virginia Surety Co., Inc.*, 224 Ill. 2d at 565-66. With these definitions in mind, the Court explained that an action that seeks relief based on the relative degree of fault is an action in contribution, rather than an attempt to shift tort liability from the party who would normally bear it to someone else. *Id.*

The same is true here. Under the "Other" heading, Triad agreed to "indemnify" TKE for any loss or injury caused by Triad, but that "indemnity" did not extend to injury or loss caused by TKE. Specifically, Triad agreed to "indemnify, defend, save harmless, discharge, release, and forever acquit ThyssenKrupp Elevator Corporation …from and

against any and all claims, ... brought against ThyssenKrupp Elevator, ... that are alleged to have been caused by the Purchaser [Triad] or any others ... ." But Triad's "duty to indemnify does not apply to the extent that the loss, property damage ... personal injury, or death is determined to be caused by or resulting from the negligence of ThyssenKrupp Elevator and/or our employees." [Zenith Dkt. 86-3 at 5-6.] Similarly, the language under the "Other Conditions" section releases TKE from liability caused by "anyone's abuse, misuse, and/or vandalism of the equipment; anyone's negligence in connection with the use or operation of the equipment;... or any other reason or cause beyond [TKE's] control that effects the use or operation of the equipment." [Zenith Dkt. 86-3 at 6.]

As in *Virginia Surety Co., Inc.,* 224 Ill. 2d at 568, the Court finds that this contract language "is not a true indemnification clause."  Rather, the language indicates the parties' intent to cover their own share of liability, permitting a claim for contribution but not a claim for indemnity. *Id.* at 566-67. Thus, the Court grants Triad's motion to dismiss Count II as it must be construed as a contribution claim and is therefore duplicative of TKE's Count I claim for contribution.

### d.  TKE's Count I  (Contribution)

Next, Triad argues that TKE's contribution claim in Count I should be dismissed as it is barred by the *Kotecki* cap. [Zenith Dkt. 88 at 5-6.] As an initial matter, for the same reasons discussed by the Illinois Supreme Court in *Virginia Surety Co., Inc.,* the indemnification language in the parties' agreement here *may* serve as a waiver of the *Kotecki* cap.[3] 224 Ill. 2d at 568-69 (concluding that De Graf has "waived its affirmative

---

[3] Triad argues that it did not waive its *Kotecki* protection because the indemnity provisions of the Maintenance Agreement do not mention workers' compensation

defense provided by the Workers' Compensation Act and is liable for unlimited contribution, undiminished by the workers' compensation limitation"). Without deciding whether the language in this Maintenance Agreement indeed waives the *Kotecki* cap, however, the Court concludes that TKE's contribution claim in Count I need not be dismissed simply because Triad's damages liability may be limited by the *Kotecki* cap.

In *Virginia Sur. Co.,* the Illinois Supreme Court explained that, under the Illinois' Contribution Act, a third party retains the right to sue an employer in contribution even where the *Kotecki* cap might apply:

> "[I]t makes no difference if the *Kotecki* cap is lower than the amount of the employee's damages that is attributable to employer's negligence. Under principles of joint and several liability, the third party does not then become liable for the difference. Instead, [the third party] always was jointly and severally liable regardless of the *Kotecki* cap **and [the third party] additionally always retained the right to sue in contribution**. The distinguishing factor is the employer's use of the affirmative defense of the Workers' Compensation Act.

224 Ill. 2d at 569 (emphasis added).

The question, then, is whether Triad can assert the *Kotecki* cap as an affirmative defense at the motion to dismiss stage, before any determination has been made about any damages that the employee, Plaintiff Carroll, may be entitled to recoup, the apportionment of liability, or how any of that compares to Triad's workers' compensation liability. Indeed, Triad did not explain or submit evidence in its motion to

---

claims and is therefore not specific enough to constitute a *Kotecki* waiver. [Zenith Dkt. 99 at 2-3.] In support, Triad cites *Estate of Willis v. Kiferbaum Const. Co.*, 357 Ill. App. 3d 1002 (1st Dist. 2005), an Illinois appellate court opinion that was issued *before* the Illinois Supreme Court opinion in *Virginia Surety,* as well as two subsequent decisions in federal district courts that cite the *Estate of Willis* decision, *Jentz v. ConAgra Foods, Inc.*, 2012 WL 3230447 (S.D. Ill. Aug. 6, 2012), and *West v. Off. Depot, Inc.*, No. 19 CV 4356, 2021 WL 5048346 (N.D. Ill. Jan. 4, 2021). As noted herein, however, the Court need not decide at this juncture whether or not the *Kotecki* cap was waived in this case.

dismiss regarding what its workers' compensation liability even is at this point. Given all of these variables, the Court cannot determine at this juncture whether Triad's contribution liability necessarily will exceed its workers' compensation liability. Likely for this reason, the case cited by Triad, *Baltzell*, 554 F. 3d 1124, and the Illinois Supreme Court case analyzed therein, *LaFever,* 185 Ill. 2d 380, deals with post-verdict waivers of a workers' compensation lien and corresponding dismissals of a contribution claim. Notably, Triad does not explain whether it has affirmatively waived any lien against Plaintiff Carroll's recovery at this point, *see Baltzell,* 554 F.3d at 1128-29 (explaining that an employer may "escape contribution liability" by waiving its lien on its employee's recovery from third parties), nor does Triad cite to any cases in which a contribution claim was dismissed at the motion to dismiss stage due to a potential *Kotecki* cap on damages. The Court therefore declines to dismiss the contribution claim at this juncture.

Thus, TKE's claim for contribution in Count I remains; the motion to dismiss is denied as to Count I. For the reasons stated above, Count II must be construed as a contribution claim, which is duplicative of Count I and will be dismissed.

### e. <u>Spoliation (Count IV)</u>

"Under Illinois law, spoliation of evidence is a form of negligence." *Martin v. Keeley & Sons, Inc.*, 2012 IL 113270, ¶ 26, 979 N.E.2d 22, 27. Thus, to prove a spoliation claim, a plaintiff must demonstrate the typical aspects of a negligence claim: (1) the defendant owed the plaintiff a duty to preserve the evidence; (2) the defendant breached that duty by losing or destroying the evidence; (3) the loss or destruction of the evidence was the proximate cause of the plaintiff's inability to prove an underlying lawsuit; and (4) as a result, the plaintiff suffered actual damages. *Id.* At the motion to dismiss stage, this Court looks to see if the respondent's complaint alleges specific facts that, if true,

would show that respondent is entitled to relief. *Twombly*, 550 U.S. at 545. The factual allegations must be sufficient to raise the respondent's right to relief above the speculative level, and respondent may not rely just on labels, conclusions, or a "formulaic recitation of a cause of action's elements[]." *Id.*

Triad argues that TKE has not alleged sufficient facts to demonstrate the first prong of a spoliation claim—that Triad owed TKE a duty to preserve the video evidence of the elevator incident. [Zenith Dkt. 88 at 9-11.] Triad further argues that TKE has not alleged facts to show that the loss or destruction of the video evidence proximately caused TKE to not be able to prove an underlying claim—rather, the loss of evidence prejudices TKE's *defense* to claims brought by Plaintiffs Carroll and Zenith, which does not give rise to a spoliation claim. [Zenith Dkt. 88 at 11-12.] Because the Court finds that TKE has not alleged sufficient facts to establish that Triad owed a duty to TKE to preserve the evidence, the Court does not reach Triad's other argument, and TKE's spoliation claim is dismissed.

As Triad correctly points out, the "general rule in Illinois is that there is no duty to preserve evidence." *Martin,* 2012 IL 113270, ¶ 27. However, under *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 190, 652 N.E.2d 267, 269 (1995), an exception to this rule may exist where both of two prongs—referred to as the "relationship" prong and the "foreseeability" prong—are met. To show a duty exists, the plaintiff must establish (1) that a relationship exists that gives rise to a duty to preserve evidence (such as an agreement, contract, statute, special circumstance, or voluntary undertaking), and (2) that the duty extends to the specific evidence at issue. *Id.* The second prong is demonstrated where "a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action." *Id.*

TKE asserts that Triad had a duty to preserve the evidence as a potential litigant, that Triad voluntarily assumed the duty to preserve, and that "special circumstances" warrant attributing a duty to preserve to Triad. [Zenith Dkt. 96 at 8-9.] In support, TKE points to the following factual assertions in its complaint:

- At all relevant times, TRIAD had installed at Waterford Estates a camera security system that provided a 24-hour camera monitoring system of certain areas of Waterford including, but not limited to, the areas immediately surrounding the 4th and Basement levels of the areas adjacent to and including the elevator doors for the Elevator, as well as the entire 4th and basement level hallways. The video for the cameras at Waterford recorded for 30 days before being recorded over automatically. [Zenith Dkt. 86 at ¶ 48]

- The video footage would have shown the elevator operating normally, Plaintiff getting out of the elevator level with the floor after the incident, whether or not Plaintiff continued to work after the incident and any post-accident impairment she experienced, and what the elevator looked like for the period of time between the incident and when TKE arrived the next day. All of this, TKE alleges, is "essential to TKE's defense of Plaintiff's claims and to TKE's third-party claims against Triad …". [Id. ¶¶ 50-53]

- Plaintiff Carroll filled out an "Employee Report of Injury" form after the incident, on which she indicated that the camera was a witness to the accident. [Id. ¶¶ 54-55]

- Plaintiff Carroll has testified that Triad had a practice and procedure, before the accident, of reviewing the video after an incident to determine what, if anything, caused the incident. [Id. ¶ 56]

- After the November 12, 2018, accident, Triad received notice of potential litigation relating to the incident via letters from Plaintiff's counsel on November 26 and December 5, 2018. [Id. ¶¶ 57-59]

- Despite receiving notice, Triad did not take any steps to preserve the video, in violation of their voluntary assumption of duty created by the notices of two pending legal actions. [Id. ¶ 60]

Notably, Triad's status as a potential litigant has been explicitly rejected as a stand-alone basis for conferring a duty to preserve evidence. In support of this theory, TKE cites *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 120-21, 692 N.E.2d 286, 289-290 (1998), a case in which the Illinois Supreme Court stated generally that

"[a] potential litigant owes a duty to take reasonable measures to preserve the integrity of relevant and material evidence." But as the Illinois Supreme Court pointed out in *Martin*, *Shimanovsky* dealt with discovery sanctions against a plaintiff for altering evidence prior to suit—*not* spoliation as a cause of action seeking to impose liability on a defendant for loss or destruction of evidence. *Martin*, 2012 IL 113270, ¶ 50. The court in *Martin* clearly stated that *Shimanovsky* "is not relevant to spoliation" and is "inapposite to the issue of whether a defendant owes a duty to preserve evidence in a spoliation of evidence claim." *Id*. ¶ 51. Thus, as the Illinois Supreme Court held in *Martin*, the fact that Triad was aware of potential litigation surrounding the elevator incident is not sufficient by itself to establish a duty giving rise to an independent claim of spoliation.

That leaves TKE's argument that Triad voluntarily assumed a duty to preserve evidence, as well as TKE's curt invocation of "special circumstances" as an additional basis for Triad's duty to preserve. [Zenith Dkt. 96 at 8-9.] Illinois caselaw does not support either one of these theories on the facts presented here, however.

"A voluntary undertaking requires a showing of affirmative conduct by the defendant evincing defendant's intent to voluntarily assume a duty to preserve evidence." *Martin*, 2012 IL 113270, ¶ 31. The *Martin* case is illustrative: plaintiffs were employees of defendant, a general contractor, who were injured on the job when a concrete I-beam used to support the bridge deck on which they were standing collapsed, throwing them into a creek. *Id*. at ¶¶ 6-7. Plaintiffs wished to sue the manufacturer and the designer of the I-beam, but their employer had destroyed the I-beam the day after the accident. *Id*. at ¶ 14. Before the I-beam was destroyed, the employer's president and two other employees visually inspected the site, took photographs, and then allowed two state agencies (Illinois Department of Transportation and the Occupational Safety and

Health Administration) to inspect the accident site. *Id.* at ¶¶11-12. The employer's president testified that he knew workers had been sent to the hospital, that he assumed there would be workers' compensation claims and that the beam could have been preserved, but also testified that he had not received any requests to preserve the beam. *Id.* at ¶¶ 15-16. The plaintiffs were not aware of the I-beam's destruction until far later, so had not had an opportunity to request that the I-beam be preserved. *Id.* at ¶ 8.

While the appellate court had held that the employer had voluntarily undertaken a duty to preserve the I-beam, the Illinois Supreme Court disagreed. While the employer had owned, possessed, and controlled the beam prior to its destruction; preserved the beam until the state agencies had completed work-site inspections; and had its own employees inspect the beam before it was destroyed, the Illinois Supreme Court concluded that these facts were insufficient to establish a voluntary undertaking. *Martin,* 2012 IL 113270, ¶ 31. In order to show a voluntary undertaking, the Court explained, the plaintiffs had to show "affirmative conduct ... showing its intent to voluntarily undertake a duty *to the plaintiffs"* in order to satisfy the first prong of the *Boyd* test. *Id.* (emphasis added).

Thus, the allegation that Triad kept surveillance video in the regular course of business, even if Triad used that video for its own investigative purposes, is not sufficient, even if proven, to support TKE's claim that Triad voluntarily assumed a duty *toward TKE* to preserve evidence. *See, e.g., Brown v. Nitro Nightclub, Inc.*, 2014 WL 2994074, 2014 IL App (1st) 131245-U, ¶¶ 2, 34 (unreported) (finding that nightclub did not owe duty to victim of hit-and-run to preserve video surveillance footage that could have identified allegedly intoxicated driver who committed the accident); *Ballerini v. Wal-Mart Stores, Inc.*, 2012 WL 7006998 *4, 2012 IL App (3d) 110423-U, ¶ 16

(unreported) (finding defendant had no legal duty to preserve video footage of plaintiff's fall in defendant's store, explaining that "defendant's internal policy to save its surveillance video if an accident occurred was not sufficient to constitute a voluntary undertaking that would create such a duty)*; Rhodes v. Illinois Cent. Gulf R.R.,* 172 Ill. 2d 213, 238, 665 N.E.2d 1260, 1272 (1996) (the law, not a defendant's internal policies, defines whether a duty exists).

Moreover, TKE has not cited any authority for the proposition that receiving notice of litigation *alone* creates a voluntary assumption of a duty to preserve video. TKE cites *Jackson v. Michael Reese Hosp. & Med. Ctr.,* 294 Ill. App. 3d 1, 10-11, 689 N.E.2d 205, 212 (1997), for the proposition that *either* notice of potential litigation *or* affirmative conduct may establish a duty to preserve, [Zenith Dkt. 96 at 8], but that case in fact held that notice of litigation and affirmative conduct together may establish a duty to preserve. There, the Illinois appellate court remanded the case where the record facts demonstrated that, after receiving notice of litigation, defendant "took affirmative conduct by segregating the X rays into a special litigation file but failed to safely segregate at a time when the defendant hospital knew the X rays would be needed for litigation." *Jackson,* 294 Ill. App. 3d at 10. While the record demonstrated these facts, plaintiff had not pled them, and so the appellate court remanded to the trial court to allow plaintiff to replead a negligent spoliation of evidence claim. *Id.* at 19.

Here, TKE does not allege in its Third Amended Third-Party Complaint that Triad took any affirmative steps to preserve the video footage after notice of litigation, and indeed alleges that Triad did not even review the camera footage. [Zenith Dkt. 86 at 14-15.] As the Illinois Supreme Court held in *Martin*, 2012 IL 113270, ¶¶ 50-51, status as a potential litigant alone does not create a duty to preserve evidence. Rather, as the

cases above demonstrate, affirmative conduct to preserve for the purpose of litigation also is needed to create a duty to preserve.

Finally, TKE mentions in passing "special circumstances" as another basis for Triad's duty to preserve evidence, [Zenith Dkt. 96 at 9], but does not cite to any legal authority in support. *Cf. Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue ...."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir.), *opinion amended on denial of reh'g*, 387 F. App'x 629 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") But even if this basis was sufficiently developed, while Illinois courts have recognized special circumstances as an alternative to the voluntary undertaking theory, they "have not precisely defined a 'special circumstance' in the context of recognizing a duty in a spoliation of evidence claim." *Martin,* 2012 IL 113270, ¶ 39. According to *Martin,* what courts have done is established that mere possession and control of the evidence is not a special circumstance, even if the plaintiffs have essentially no opportunity to request that the evidence be preserved. *Id.* at ¶¶ 44-46. Likewise, neither the employer-employee relationship nor status as a potential litigant creates a "special circumstance." *Id.* at ¶¶ 48-51.

Triad also argues that TKE has not alleged facts showing that the loss or destruction of evidence proximately caused TKE to not be able to prove an underlying claim—rather, just that the loss of evidence may prejudice TKE's *defense* to claims brought by Plaintiffs Carroll and Zenith. [Zenith Dkt. 88 at 11-12; dkt. 99 at 8-9.] Having

found that TKE has failed to allege facts giving rise to a duty to preserve, the court need not address this issue. TKE's spoliation claim (Count IV) is dismissed.

## II.    Triad's Motion to Amend its Answer to Count III to Add an Affirmative Defense

In Count III of TKE's Amended Complaint, filed in October 2022, TKE alleges that the parties' Maintenance Agreement explicitly required Triad to name TKE as an additional insured on Triad's liability and umbrella insurance policies, but Triad failed to do so. [Zenith Dkt. 86 at 10-11.]  TKE alleges that Triad's president, Blake Vail, has admitted under oath that he failed to add TKE to its insurance policy with Church Mutual and that, as a result, TKE is forced to incur costs to defend itself against claims brought by Plaintiffs that otherwise should be covered by Triad's insurance carrier. [Id. at 11-12.]

After TKE filed its motion for summary judgment on this count (addressed in the next section), Triad moved to amend its answer to include the affirmative defense of contributory negligence. [Zenith Dkt. 116.] Triad asserts that TKE is also at least partially to blame for the oversight because, throughout the three-year period between when the Maintenance Agreement was signed and when the incident occurred, TKE never asked Triad for a certificate of insurance. [Id.] TKE opposes the amendment and has moved to strike the proposed affirmative defense based on legal insufficiency. [Zenith Dkt. 123.]

Typically, amendments to an answer are freely allowed, so long as the other party will not be prejudiced by the tardy assertion of them. *See Robinson v. Sappington*, 351 F.3d 317, 332-33 (7th Cir. 2003). While TKE argues that Triad has had "repeated opportunities" to inform the Court that it intended to amend its answer to add this

affirmative defense but nevertheless delayed in asserting it, [Zenith Dkt. 123 at 2], Triad responds that the affirmative defense was the subject of deposition testimony in June 2022 and February 2023, so TKE has been on notice of this potential defense. [Zenith Dkt. 124 at 5, 22-24 (Exhibit B).]  While the timing of Triad's motion to amend is not ideal, the Court does not find that TKE has been prejudiced by the somewhat late assertion—TKE has had an opportunity to respond to the motion, [Zenith Dkt. 123], and to address the proposed affirmative defense in its summary judgment reply brief, [Zenith Dkt. 122].

That said, there are larger problems with Triad's proposed affirmative defense— namely, that contract law in Illinois does not recognize "contributory fault" as an affirmative defense to a breach of contract claim. *See Outboard Marine Corp. v. Babcock Industries, Inc.*, 106 F.3d 182, 184–5 (7th Cir. 1997) (noting in warranty case under Illinois law that "there is no contract doctrine of contributory or comparative negligence").  Rather, a breach of contract *may* be excused based on the other party's contributory negligence if that party's negligence *prevented* the other party from performing their obligations under a contract.  *See Sneeze, Wheeze & Itch Assocs., Inc. v. Dynavax Techs. Corp.*, No. 09-1190, 2010 WL 11553203, at *4 (C.D. Ill. June 14, 2010) (explaining, in diversity action applying Illinois law, that "generally speaking, contributory fault is not a contract theory" but "a breach of contract is excused if the promisee's hindrance or failure to cooperate prevented the promisor from performing the contract"), *citing Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 453–4 (7th Cir. 1982) (*citing* Restatement (Second) of Contracts § 245 (1979)). But Triad makes no such allegations here that it was prevented from performing its contractual obligations. Rather, Triad argues merely that TKE should have figured out, at some point during the

three-year period between the signing of the Agreement and the incident at issue here, that Triad had not named TKE on its insurance, and therefore had not done what it had promised to do under the Agreement. TKE's failure to ask for an insurance certificate certainly did not prevent Triad from naming TKE on its insurance, as required by the Agreement's terms.

While Triad's argument may be relevant in computing damages, it is not an "affirmative defense." *See Outboard Marine Corp.*, 106 F.3d at 185 (explaining that promisee's failure to exercise general duty of care may be relevant for computing damages because "[t]he promisor who breaks his promise is liable only for the harm that he causes, which is to say the harm that would have been avoided had he not broken his promise"). In fact, the *Scarsdale* case cited by Triad supports this understanding. In *Scarsdale Villas Assocs., Ltd. v. Korman Assocs. Ins. Agency, Inc.*, 178 Ill. App. 3d 261, 263-64, 533 N.E.2d 81, 83 (1st Dist. 1988), the defendant, an insurance broker, raised a contributory negligence argument based on plaintiff's failure to notice that the insurance policies brokered by defendant did not include flood insurance. While the Illinois appellate court decision refers to this as an "affirmative defense," the reality is that the import of this "defense" was relegated to the damages award. The jury returned a verdict against the defendant, but reduced the damages award by 33% to account for plaintiff's contributory negligence.

The second case cited by Triad, *Floral Consultants, Ltd. v. Hanover Ins. Co.*, similarly held that "while the insured's failure to read the policy may amount to contributory negligence, **it does not operate as a bar to relief as a matter of law."** 128 Ill. App. 3d 173, 176, 470 N.E.2d 527, 529 (1st Dist. 1984) (emphasis added). In other words, to the extent "contributory negligence" may come into play at all in this

case, it will be in the allocation of damages, not as a bar to TKE's claim. *See* BLACK'S LAW DICTIONARY 509 (10th ed. 2014) (defining "affirmative defense" as "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's … claim, even if all the allegations in the complaint are true"); *see also Bell v. Taylor,* 827 F.3d 699, 704–05 (7th Cir. 2016).

For these reasons, Triad's motion to amend its answer to add the affirmative defense of contributory negligence is denied.

### III. TKE's Motion for Summary Judgment on Count III

TKE has moved for summary judgment on Count III of its complaint, alleging that Triad breached its contract with TKE by failing to name TKE on Triad's insurance, as required by the Maintenance Agreement. [Zenith Dkt. 86 at 10-12; Zenith Dkt. 113, TKE's Motion for Partial Sum. J.]

#### a. Factual Background

The following facts are undisputed. TKE and Triad entered into the Maintenance Agreement in 2015 and, through the terms of that Agreement, Triad agreed to secure primary and non-contributory insurance for TKE and to name TKE as an additional insured on Triad's policies. [Zenith Dkt. 117, Triad's Resp. to TKE's Stmt. Of Facts, at 6.] Specifically, the "Insurance" portion of the Agreement reads:

> You expressly agree to name ThyssenKrupp Elevator Corporation along with its officers, agents, affiliates, and subsidiaries as additional insureds in your liability and any excess (umbrella) liability insurance policy(ies). Such insurance must insure ThyssenKrupp Elevator Corporation along with its officers, agents, affiliates, and subsidiaries. Such insurance must specify that its coverage is primary and non-contributory. You hereby waive the right of subrogation.

[Id.; Zenith Dkt. 86-3, at 6.] Despite this provision, Triad's President, Blake Vail, has admitted under oath both that he was the individual responsible for complying with this

provision and that he undertook no steps to comply with the Insurance provision. [Zenith Dkt. 117 at 7.] He further admitted to knowing of no documents that would show that Triad, their insurance broker, or anyone working on Triad's behalf complied with the "Insurance" section of the Maintenance Agreement. [Id.] The parties further agree that TKE made a tender to Triad's insurer, Church Mutual Company, in connection with this lawsuit, and that Church Mutual informed TKE that Triad had not named TKE as an additional insured on Triad's primary and excess insurance policies. [Id. at 6-7.] The parties also agree that the total value of Triad's insurance policies with Church Mutual is $6 million. [Id.]

### b. Legal Standard

Summary judgment is appropriate where there is "no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). This does not mean that summary judgment is never appropriate when the parties disagree on some of the facts; rather, a properly supported motion for summary judgment may still be granted if those disputes are either not genuine or not material. *Id.* Whether a factual dispute is "material" depends on the substantive law governing the dispute; "[F]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* (*citing* 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93–95 (1983)). A factual dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

At the summary judgment stage, the Court does not weigh evidence or determine the truth of the matter. *Anderson,* 477 U.S. at 248. Rather, the Court views the facts "in the light most favorable to the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Generally, the party seeking summary judgment bears the initial responsibility

of proving that there is no genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and then the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255.

TKE's claim for failure to procure insurance is premised on a breach of contract. *See Litterer v. United States*, 545 F. Supp. 3d 625, 631 (N.D. Ill. 2021) ("Contracts to procure insurance are analyzed under the general principles of contract law.") (*citing Medline Indus., Inc. v. Ram Med., Inc.*, 892 F. Supp. 2d 957, 967 (N.D. Ill. 2012)). "In Illinois, a plaintiff claiming breach of contract must establish: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *See Sevugan v. Direct Energy Servs., LLC,* 931 F.3d 610, 614 (7th Cir. 2019) (internal quotation marks omitted).

### c. Analysis

The parties do not dispute element one, the existence of a valid and enforceable contract. Triad argues, however, that disputed facts preclude summary judgment on the second and third elements. Regarding the second element, substantial performance, Triad argues that the ongoing factual dispute about what and who caused the elevator incident on November 12, 2018, prevents summary judgment. [Zenith Dkt. 117 at 6; Zenith Dkt. 121 at 9-10.] While TKE argues that Triad failed to keep the operation room at the appropriate temperature, Triad argues that TKE should have (and was required by the Agreement to) shut down the elevator if it believed there was a potential for harm to the public. [Zenith Dkt. 117 at 6.] While Triad does not put forth any specific facts or evidence at summary judgment showing that TKE was aware of a risk of harm to the public prior to the incident yet chose not to shut down the elevator, Triad's argument seems to be that TKE breached the agreement by failing to "properly maintain the

26

elevator pursuant to the Maintenance Agreement," by not shutting down the elevator in advance of the incident at issue here, and that this breach would prevent TKE from recovering for Triad's breach for failure to obtain insurance. [Zenith Dkt. 117 at 6.]

Regarding element three—whether Triad breached the agreement—Triad also argues that a dispute of fact precludes summary judgment. Triad argues that it remains unresolved whether TKE is still covered under Triad's policy with Church Mutual, notwithstanding the undisputed facts that Triad's president did not affirmatively name TKE on the policies and that Church Mutual has rejected TKE's tender. [Zenith Dkt. 117 at 6-8; Dkt. 118 at 7, 11.] Triad argues that the Church Mutual policy may have been broad enough to satisfy an obligation to insure TKE even without Triad affirmatively naming TKE, because the Church Mutual policy covered "insured contracts" and defined those as including "elevator maintenance agreements." [Zenith Dkt. 117 at 7-8; Dkt. 115 at 10-11.] TKE responds that the Agreement required Triad to "expressly" name TKE as an additional insured, and failure to take that affirmative step constitutes a breach of the agreement. [Zenith Dkt. 122 at 2-3.]

The Court begins by analyzing whether either of these fact disputes are genuine and material, such that summary judgment is unavailable. *See James v. Hale*, 959 F.3d 307, 310 (7th Cir. 2020) ("It is axiomatic that the first step in the summary-judgment process is to ask whether the evidentiary record establishes a genuine issue of material fact for trial.").

### i. Whether TKE's Alleged Breach of the Maintenance Agreement Precludes Summary Judgment

The Court deals first with the factual dispute about the cause of the elevator incident. At the heart of this litigation is the allegation that the elevator drop was caused

by TKE, which Triad essentially argues is also an alleged breach of their Maintenance Agreement. However, Triad also admits that TKE is *still performing* pursuant to the Maintenance Agreement, [Zenith Dkt. 125 at ¶17], and while Triad argues that TKE may have breached the Agreement leading to Plaintiff Carroll's injury, Triad does not actually support this allegation with any specific facts or evidence supporting an alleged breach. *See Anderson*, 477 U.S. at 248 (explaining that "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but … must set forth specific facts showing that there is a genuine issue for trial.") (internal citations omitted). Rather, Triad points to the complaint allegations of Carroll and Zenith and the contract language requiring TKE to shut down the elevator if it determined that there was an operational problem that jeopardized the safety of the riding public. [Zenith Dkt. 117 at 6, *citing* Dkt. 115, Triad's Add'l Stmt. of Facts, ¶¶1, 2, and 6.] Triad does not point to any evidence showing that TKE had made any determination or been notified that the elevator was unsafe, nor does Triad point to any specific maintenance activity that TKE was required to do under the Agreement but failed to do.

Even if TKE is liable for Carroll's injury due to negligence, it does not necessarily follow that TKE breached its duties under the Maintenance Agreement, and Triad does not point to any support for such a position. Moreover, even a generous construction of the facts in Triad's favor would not legally bar TKE from recovery for Triad's breach, contrary to what Triad argues. [Zenith Dkt. 117 at 6; Zenith Dkt. 124 at 2-3.] Under Illinois law, when both parties breach a contract but continue performance, which is *the most* that Triad's argument can reach here, the situation is considered a "partial" breach

and each side is permitted to seek damages for the other party's breach. *PML Dev. LLC v. Vill. of Hawthorn Woods*, 2023 IL 128770, at ¶ 66.

This is in direct contrast to Triad's legal argument, which relies heavily on the Illinois appellate court decision in *PML Dev. LLC v. Vill. of Hawthorn Woods*, 2022 IL App (2d) 200779, ¶ 41, 210 N.E.3d 242, 250, *appeal allowed*, 197 N.E.3d 1139 (Ill. 2022), *and rev'd*, 2023 IL 128770, ¶ 42. The Illinois Supreme Court, however, recently overturned that appellate court decision in relevant part, holding that in situations where both parties breach a contract but elect to continue their agreement, both sides *are* permitted to seek damages from the other side. 2023 IL 128770, at ¶ 66. Thus, even if the Court were to accept as correct Triad's argument that TKE somehow breached the Agreement three years into performance by not shutting down the elevator in advance of the accident, as a matter of Illinois law, this would not preclude summary judgment on TKE's claim that Triad had been in breach of the insurance provision from the very beginning, so long as TKE otherwise continued to substantially perform under the Agreement, which is undisputed. Accordingly, even with a dispute of fact about who is responsible for the elevator accident, the outcome of that question is not material to TKE's breach of contract claim.

For clarity's sake going forward, this Court notes that TKE's claim is limited to breach of the contractual promise to insure, *not* a duty to defend. *See Litterer,* 545 F. Supp. 3d at 635 (explaining that agreement to obtain insurance is not an agreement *of* insurance and thus, there is no duty to defend based on failure to procure insurance). While Triad attacks TKE's citation to authority regarding a duty to defend, [Zenith Dkt. 117 at 8-10], TKE clarifies in its reply that it is not seeking a defense from Triad, but only contractual damages for breach of contract regarding its promise to insure. [Zenith Dkt.

122 at 3-4.] Since contract damages are the appropriate remedy for breach of a contractual duty to insure, *see id.,* this clarification resolves this concern. *See also FHP Tectonics Corp. v. NES Rentals Holdings, Inc.,* 2016 IL App (1st) 141650-U, ¶ 57, 2016 WL 3387306) (explaining that promisor who promises to obtain insurance and fails to do so may be "liable for breach of contract and the corresponding payment of damages if he fails to procure the appropriate insurance").

### ii. Whether Triad's Alleged Potential Satisfaction of its Duty to Provide Insurance Precludes Summary Judgment

Triad also argues that summary judgment is inappropriate because a question of fact remains as to whether TKE is nevertheless covered under Triad's insurance policies with Church Mutual. [Zenith Dkt. 117 at 6-8.] While Triad admits that it failed to affirmatively name TKE in its insurance policies with Church Mutual, Triad contends that TKE still may be covered under the "insured contract" provision of the Church Mutual policies, which defines an "elevator maintenance agreement" as an insured contract. [Id.] TKE argues in response that the suggestion that TKE *might* be covered by the Church Mutual policies does not satisfy Triad's express duty under the Agreement to name TKE on its insurance policies as an additional insured. [Zenith Dkt. 122 at 2-3.] Because it is undisputed that Triad failed to take the affirmative step to name TKE in its insurance policies as explicitly required by the contract, and because the question of whether or not TKE should or will be covered under the "insured contracts" provision of the Church Mutual policies is not before this Court and therefore cannot be resolved at trial, the Court agrees with TKE.

In the "Insurance" provision of the contract, Triad "**expressly agree[d] to name** ThyssenKrupp Elevator Corporation along with its officers, agents, affiliates, and

subsidiaries **as additional insureds** in [Triad's] liability and any excess (umbrella) liability insurance policy(ies)." [Zenith Dkt. 115-2 at 27.] (emphasis added). The Court finds that a plain reading of this language is that Triad was required to take the affirmative step *of "naming"* TKE as an additional insured on its policies with Church Mutual. *See McWane, Inc. v. Crow Chicago Indus., Inc.,* 224 F.3d 582, 584 (7th Cir. 2000) ("[T]he meaning of the contract must be determined from the words or language used, and a court cannot place a construction on the contract which is contrary to the plain and obvious meaning of the language.") (internal citations omitted).

Triad's president readily admits that he did not do this, nor did anyone else at Triad. [Dkt. 115 at 7.] TKE bargained for the protection inherent in being explicitly and unequivocally recognized as an additional insured on the Church Mutual policies, which is different than the insurance coverage dispute in which it now finds itself. Triad's post-hoc attempt to rely on the "insured contract" language in the policy is not sufficient to satisfy its express promise *to name* TKE in the policies. The insufficiency is now evident, as Church Mutual has refused at this point to recognize TKE as an additional insured and has rejected TKE's tender, even if TKE is able to litigate its entitlement to coverage down the road. [Dkt. 115 at 7.]

Triad relies on *Litterer v. United States* for its argument that TKE's potential coverage under the "insured contracts" provision might satisfy its duty to procure insurance. [Zenith Dkt. 117 at 7.] The facts of that case are somewhat similar; Defendant UMS was a custodial services company that had contracted with third-party plaintiff, the City of Chicago, to provide cleaning services at O'Hare Airport. 545 F. Supp. 3d at 629. After she experienced a slip-and-fall incident at the airport, Plaintiff Litterer sued the City, UMS, and two other defendants, and the City filed crossclaims against UMS for

failure to defend and failure to procure insurance. *Id.* at 628-29. As relevant here, UMS argued at summary judgment on the crossclaims that it had met its obligation to procure insurance, despite that its insurer declined the City's tender, because UMS's insurance policy contained an "Additional Insured – Designated Person or Organization" section that stated:

> Any person or organization [that UMS is] required to add as an additional Insured on this policy under a contract or agreement shall be an Insured, but only with respect to that person's or organization's liability arising out of [UMS's] operations as a "Staffing Service" or premises owned by or rented to [UMS].

*Id.* at 632. The court agreed, finding that the parties' agreement only required UMS to provide insurance that would cover direct and indirect liability that was the result of UMS's actions, and that this provision of the insurance policy was coterminous with that obligation. *Id.* at 633-34.

Here, Triad's insurance policy with Church Mutual does not contain the same language stating that "any person or organization" that Triad is "required to add as an additional insured" will be treated as "an Insured." Rather, the policy language Triad seeks to rely on is as follows:

**A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY COVERAGE**

1. Insuring Agreement.

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages...

   ***

2. Exclusions.

   This insurance does not apply to:

...

b. "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This Exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement.

(2) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract," reasonable attorney fees and necessary litigation expenses incurred by or far a party other than an insured are deemed to be damages because of "bodily injury" or "property damage" provided:

(a) liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

***

9. "Insured contract" means:

***

(e) An elevator maintenance agreement

[Zenith Dkt. 115 at ¶ 8.]

This insurance policy language suggests that Church Mutual will cover liability incurred *by Triad* pursuant to an elevator maintenance agreement, but that is not necessarily the same as saying Church Mutual will recognize the other party to the elevator maintenance agreement as an additional insured on the policy, as was the case in *Litterer*. Thus, Triad's policy language does not fulfil Triad's contractual promise to "name" TKE "as an additional insured." [Zenith Dkt. 115-2 at 27.]

The ultimate question of whether or not TKE is entitled to insurance coverage from Church Mutual based on the "insured contract" provision of Triad's policy is a matter that, ultimately, cannot and will not be resolved by this Court; at best, this question may be presented for adjudication by some other tribunal with jurisdiction over Church Mutual (who is not a party to this action). It is within the parties' hands to seek a binding resolution of whether TKE is entitled to coverage and, to this Court's knowledge, neither TKE nor Triad has attempted to seek a declaratory judgment on that matter. To postpone ruling on TKE's breach of contract claim for a coverage determination that may never come, and is not even being actively sought, would be to postpone resolution of this case indefinitely. Moreover, if TKE is eventually able to avail itself of coverage by Church Mutual, then that coverage would mitigate the damages that Triad would owe to TKE, but it does not change the undisputed fact that Triad did not name TKE on the policy, as explicitly required by the Maintenance Agreement.

Thus, while there is a dispute about whether or not TKE may eventually be covered under the "insured contracts" provision of Triad's policies with Church Mutual, the Court does not find that it is "genuine" in the sense that a factfinder in this case could find in Triad's favor, nor is it material since Triad still breached the express promise to "name" TKE in the policy. *See, e.g., Anderson,* 477 U.S. at 248 (explaining that the law considers a dispute genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

### iii. Summary Judgment on TKE's Count III

In order to establish breach of contract for a failure to procure insurance, TKE must demonstrate that, taking the facts in the light most favorable to Triad, the following elements are met: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages. *See Sevugan, LLC,* 931 F.3d at 614. This Court finds that TKE has met its burden, and grants summary judgment in TKE's favor. *See, e.g., Jokich v. Union Oil Co. of California,* 214 Ill. App. 3d 906, 913, 574 N.E.2d 214, 219 (1st Dist. 1991) (upholding trial court's grant of summary judgment to third-party plaintiff Union Oil for defendant's breach of promise to procure insurance because policy ultimately did not name Union Oil as an additional insured, even though defendant affirmatively applied for policy naming Union Oil as an additional insured and erroneous certificate was issued mistakenly showing Union Oil had been named on policy).

Taking the undisputed facts as they exist today, and drawing all inferences in favor of Triad, the Court finds that summary judgment on TKE's failure to procure insurance claim is warranted. The parties do not dispute the first element—a valid and enforceable agreement—existed. Under that agreement, Triad was to take the affirmative step of naming TKE in its insurance policies. As to the second element, Triad admits that "TKE is still performing pursuant to the Maintenance Agreement with Triad.[4]" [Zenith Dkt. 125 at ¶ 17.] Moreover, while Triad alleges that TKE breached the

---

[4] The Court notes that this statement of fact was made in TKE's statement of additional facts in reply to Triad's Local Rule 56.1 statement. [Dkt. 121 at ¶ 17 at page 15.] Triad takes issue with TKE submitting a statement of additional facts, arguing that LR 56.1 does not permit a moving party to submit a statement of additional facts. The Court notes that LR 56.1 does not *prohibit* a party from submitting a statement of additional facts, however. *Cf. Basta v. Am. Hotel Reg. Co.*, 872 F. Supp. 2d 694, 698–99 (N.D. Ill.

contract, as discussed above, even if Triad were to prove that allegation at trial, it would at best be a "partial breach" that does not prevent TKE from being able to recover for Triad's breach.

As for Triad's breach, it is undisputed that Triad did not take the affirmative step of naming TKE in its insurance policies, and as discussed above, this Court finds that this undisputed fact is sufficient to establish a breach by Triad, regardless of whether TKE may ultimately obtain insurance through another tribunal's interpretation of the "insured contract" clause. *Id.*

Finally, though they are not fully calculable at this juncture, TKE has damages due to Triad's breach. Given Church Mutual's rejection of TKE's tender, TKE is currently on the hook for litigation costs that would have been covered by the insurance policies, including its own litigation costs and any ultimate liability.

For the foregoing reasons, TKE's motion for summary judgment on Count III is granted.

---

2012) (explaining that, while "this Court has considerable discretion to mandate strict compliance with Rule 56.1, including to mandate that filings pursuant to the Rule be done in compliance with the Court's own orders and deadlines," it would not strike plaintiff's tardy submission of a statement of additional facts because "such a harsh remedy is not warranted in this case."). Moreover, the additional facts still do not exceed the 80-statement limitation in LR 56.1, and the circumstances are unique here, as Triad moved to amend its answer *after* TKE already had filed its motion for summary judgment. [Dkt. 116.] Triad has responded to TKE's additional statements of fact and admitted to several of them, demonstrating that there is no genuine dispute as to at least some of those facts. [Dkt. 125.] This Court therefore finds that there is no prejudice to either party by allowing TKE's submission of additional facts. *See Kasak v. Vill. Of Bedford Park*, 563 F. Supp. 2d 864, 870 (N.D. Ill. 2008) (allowing plaintiff to file 16 additional facts beyond the 80 statements allowed by the rule because the additional number was not so excessive and "the Court is not required to spend significant resources to resolve disputes surrounding [] undisputed facts [].") As relevant here, Triad has admitted to TKE's statement that "TKE is still performing pursuant to the Maintenance Agreement with Triad," and it is therefore not in dispute. [Zenith Dkt. 125 at paragraph 17.]

Date:  8/23/23

_____

Beth W. Jantz, U.S. Magistrate Judge